**LANE COUNTY AUDUBON SOCIETY, et al., Plaintiffs–Appellants/Cross–Appellees,**

v.

**Cy JAMISON, et al., Defendants–Appellees/Cross–Appellants.**

Nos. 91–36019, 91–36340.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1992.

Decided March 4, 1992.

to higher Courts (the Courts of Appeals and the Supreme Court) by the Internal Revenue Service or the Petitioner(s)."

Todd D. True, Sierra Club Legal Defense Fund, Seattle, Wash., for plaintiffs-appellants/cross-appellees.

Edward A. Boling, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees/cross-appellants.

Before CHOY, SCHROEDER and T.G. NELSON, Circuit Judges.

SCHROEDER, Circuit Judge:

In June of 1989, the United States Fish & Wildlife Service (FWS) proposed listing the northern spotted owl as a threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531 et seq. (ESA). *See* 54 Fed. Reg. 26666 (June 23, 1989). In addition, in October of 1989, the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl (the ISC) was formed to "develop a scientifically credible conservation strategy for the northern spotted owl."[1] In May of 1990, the ISC issued its Final Report, concluding that the lack of a consistent planning strategy has resulted in a high risk of extinction for the owl. In June of 1990, the FWS listed the northern spotted owl as a threatened species pursuant to the ESA. *See* 55 Fed.Reg. 26189 (June 26, 1990). The FWS based its decision to list the owl on its finding that "[e]xisting regulatory mechanisms are insufficient to protect either the northern spotted owl or its habitat." *Id.* at 26190.

In response to these events, the Bureau of Land Management (BLM), which manages approximately 1,149,954 acres of the remaining old growth forests suitable for spotted owl habitat in western Oregon, promulgated a document entitled "Management Guidelines for the Conservation of the Northern Spotted Owl, FY 1991 through FY 1992", commonly known as the "Jamison Strategy" ("the Strategy").[2] In this Strategy, the BLM essentially sets forth the criteria for selection of land for logging in the millions of acres administered by the BLM in Washington, Oregon and California. The BLM described the Jamison Strategy as "a four-phase plan ... which will direct BLM management of western forest lands into FY 1994 and beyond." The Strategy contains management guidelines for fiscal years 1991 and 1992, including a program to offer 750 million board feet of timber for sale each year. The Strategy was designed to be implemented immediately.

---

1. The ISC was established under the authority of an interagency agreement between the Forest Service, the BLM, the FWS and the National Park Service. The ISC's charter was signed by the agency heads and subsequently incorporated into Section 318 of Public Law 101–121 in October 1989. *See* Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101–121, 103 Stat. 701, 745–50 (1989).

2. This court has not been provided with an official citation to the Strategy, *but see* Dept. of Interior, Bureau of Land Management: Management Guidelines for the Conservation of the Northern Spotted Owl FY 1991 Through FY 1992 & Appendix A, Northern Spotted Owl: The Jamison Plan Detailed Management Strategy (September 24, 1990).

On December 4, 1990, Lane County Audubon Society and various environmental groups (Lane County), filed the requisite 60–day notice of their intention to file an ESA citizen suit to challenge the BLM's failure to consult with the FWS on the Strategy pursuant to 16 U.S.C. § 1536 ("Section 7") of the ESA.[3] *See* 16 U.S.C. § 1540(g)(2)(A)(i). In January of 1991, the BLM submitted about 174 proposed timber sales to be conducted in fiscal 1991 to the FWS for consultation pursuant to section 7 of the ESA, but did not submit the Jamison Strategy itself.

Lane County then filed this action in United States District Court for the District of Oregon seeking an injunction barring the conduct of any sales until the Jamison Strategy had undergone the consultation process.[4] The district court

---

**3.** Section 7 of the ESA provides, *inter alia:*

(a)(1) [ ...] All ... federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species....
(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or advance modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.
....
After completion of the consultation process pursuant to 16 U.S.C. § 1536(a)(1) & (2), the Secretary shall promptly provide the agency with:
(b)(3)(A) [ ...] a written statement setting forth the Secretary's opinion ... detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) [of this section] and can be taken by the [agency] or applicant implementing the agency action.

. . . . .

(4) If after consultation under subsection (a)(2) [of this section,] the Secretary concludes that—
(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;
(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection....

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—
(i) specifies the impact of such incidental taking on the species,
(iii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

. . . . .

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be compiled with by the Federal agency or applicant (if any) or both to implement the measures specified under clause (ii) & (iii).
....
(c)(2) Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.
(d) After initiation of consultation ... [the agency] shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure which would not violate subsection (a)(2) [of this Act].
See 16 U.S.C. § 1536(a)(1)–(2); (b)(3)(A)–(B); (c)(2); (d) (1991).

**4.** The battle between environmentalists and the government over owl habitat is being fought on several fronts. This court's most recent opinion in *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297, (9th Cir.1991), affirmed the District Court for the Western District of Washington's decision enjoining the Forest Service from logging in any area containing spotted owl habitat pending the Service's compliance with the National Forest Management Act. That injunction covers Forest Service lands in Washington, Oregon and California. Additionally, this court reversed the District Court for the District of Oregon's decision finding that Section 312 of the 1990 Appropriations Act continued to bar plaintiffs' attempts to bring a National Environmental Policy Act challenge to the BLM's activities in Ore-

agreed with Lane County that the Jamison Strategy is an "action" within the meaning of section 7 of the ESA and held that the BLM had violated that section by failing to consult with the FWS to obtain that agency's biological opinion regarding the effects of the Strategy on the northern spotted owl before implementing the Strategy. The district court on April 4, 1991, enjoined the BLM from implementing the Strategy pending compliance with section 7, but stated in its order that the 1991 sales were not affected by its order. At the time of the district court's order, the FWS had reviewed 174 of the proposed 1991 sales and had declared that 122 of these would not be likely to jeopardize the owls' habitat, provided the remaining 52, the so called "jeopardy sales," would take place only within the strict limitations provided for in the FWS' biological opinion.[5] In reviewing the 1991 sales, FWS had before it the Jamison Strategy and found its criteria insufficient to protect owl habitat. It applied instead the criteria recommended in the ISC Final Report.

Lane County now appeals the district court's refusal to enjoin the 1991 timber sales. It seeks an injunction, pending completion of consultation on the Jamison Strategy, prohibiting all future sales on BLM lands in the affected area, including the 1992 sales and the remaining 1991 sales that have not yet been awarded.

The BLM cross-appeals the district court's order holding that the Jamison Strategy is "agency action" and requiring the BLM to submit the Strategy for consultation. The BLM contends that the Jamison Strategy is not an "action" requiring consultation and that it is merely a voluntarily created "policy statement." Moreover, the BLM contends that it has in fact substantially complied with the ESA by submitting the individual 1991 sales for

section 7 consultation, and so, an injunction is unwarranted.

We hold that the district court correctly declared the Jamison Strategy itself to be an agency action and correctly enjoined its implementation pending consultation. We further hold that all future sales the BLM proposes to conduct are also "agency actions" and should not go forward until consultation is satisfactorily completed on the sales and on the Jamison Strategy itself or on another functionally similar plan establishing the governing criteria for sale site selections on BLM land. We enjoin, pending completion of such consultation, the award of any sales that may be announced in the future. The status of the remaining announced, but not yet awarded, 1991 sales is somewhat different, since those sales have already been submitted to the FWS. We remand to the district court for reconsideration of whether the award of those sales should also be enjoined based upon our holding today.

I

■ We turn first to the Jamison Strategy itself. It is intended to establish interim timber management standards to replace standards set forth in the old Timber Management Plans (TMPs) pending issuance of new TMPs. TMPs are discussed in some detail in *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1234–35 (9th Cir. 1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990) ("PAS"). The TMPs are 10–year plans that "designate commercial forest land under BLM management in [each] district for one of several uses." *Id.* at 1234. TMPs do not designate specific timber-sale boundaries, or require that any particular area be harvested. *Id.* at 1235. Rather, they decide land-use allocation and set the "annual allowable harvest" for each district. *See id.*

gon owl habitat areas and remanded with instructions that plaintiffs be granted leave to amend their complaint to add such a challenge.

**5.** The BLM is currently seeking exemption from the provisions of the ESA with regard to 44 of these jeopardy sales in a proceeding before the

Endangered Species Committee. *See Bureau of Land Management v. U.S. Fish and Wildlife Service*, ESA 91–1. *See generally*, 16 U.S.C. § 1536(e)–(*o*). The parties have moved to supplement the record on appeal with documents and testimony from proceedings before the Committee. The motions are denied.

The BLM itself described its Jamison Strategy as an "interim strategy" to be carried out while new management plans are prepared. The Strategy outlines in detail the various criteria that will be used to develop the 1991 and 1992 timber sales. It develops a "detailed management strategy" to be carried out in four phases to cover fiscal years 1990 through 1994 "and beyond." Like the TMPs, it establishes total annual allowable harvests. The impact of each individual sale on owl habitat cannot be measured without reference to the management criteria established in the TMPs and the Jamison Strategy.

Section 7(a)(2) of the ESA requires the Secretary of the Interior to ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species. To this end, section 7(b) sets out a process of consultation whereby the agency with jurisdiction over the protected species issues to the Secretary a "biological opinion" evaluating the nature and extent of jeopardy posed to that species by the agency action. 16 U.S.C. § 1536(b). In order to maintain the status quo, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation period. *Id.* § 1536(d).

Section 7 specifically provides that a federal agency (the "action" agency) *shall* "in consultation with ... the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." *Id.* § 1536(a)(2) (emphasis added).

Procedural guidelines for complying with this consultation requirement are codified at 50 C.F.R. Part 402. The FWS implementing regulations under the ESA require agencies to review their action "at the earliest possible time to determine whether any action may affect listed species." *Id.* § 402.14(a). The FWS defines agency "action" broadly to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies...." *Id.* § 402.02. Examples include but are not limited to:

> (a) actions intended to conserve listed species or their habitat;

> (d) actions directly or indirectly causing modifications to the land, water, or air.

*Id.* This court also interprets the term "agency action" broadly. *Conner v. Burford,* 848 F.2d 1441, 1452 (9th Cir.1988), *cert. denied sub nom Sun Exploration & Prod. Co. v. Lujan,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) (citing *TVA v. Hill,* 437 U.S. 153, 173 & n. 18, 98 S.Ct. 2279, 2291 & n. 18, 57 L.Ed.2d 117 (1978) (Supreme Court held that Congress had explicitly foreclosed the exercise of discretion by courts faced with a violation of section 7 of the ESA)).

We agree with the district court that "without a doubt," the Jamison Strategy as announced was to be an agency action "authorized, funded or carried out by the BLM." *See* District Court Order, September 11, 1991; quoting 16 U.S.C. § 1536(a)(2). Moreover, the Jamison Strategy is action that "may affect" the spotted owl, since it sets forth criteria for harvesting owl habitat. It falls squarely within the definition of agency action set forth in 50 C.F.R. § 402.02. Accordingly, the BLM must submit the Jamison Strategy to the FWS for consultation before the Jamison Strategy can be implemented through the adoption of individual sale programs. In implementing the Jamison Strategy before consultation with the FWS, the BLM has violated the ESA. The district court properly enjoined implementation of the Strategy.

## II

■ This brings us to Lane County's appeal regarding sales. Lane County asks that all sales be enjoined pending consultation on the Jamison Strategy. The government acknowledges that sales are "actions" under section 7 and require ESA consultation. The government contends, however, that despite the district court's injunction against implementation of the

Jamison Strategy, individual sales may nevertheless go forward under the TMPs promulgated between 1979 and 1983 rather than the Jamison Strategy. The TMPs were, of course, not submitted for consultation at the time they were promulgated, because the owl was not listed as a threatened species until 1990. The government argues that the sales may go forward because Lane County has not challenged the TMPs under the ESA.

This is not a tenable position, for if the Jamison Strategy is an "action" requiring consultation, then clearly the BLM's reinstatement of the TMPs would also constitute such action. The two documents serve the same function with respect to sales. Moreover, in adopting the Jamison Strategy in the first place, the government recognized that a new, interim underlying strategy was necessary after the owls were listed pursuant to the ESA, because the old TMPs were inadequate to meet the requirements of that Act.

In addition, in previous appearances before this court, the BLM has successfully argued that because its decision on an individual sale necessarily implicated the underlying programmatic EIS for the TMPs to which the individual sale decisions were tiered, a challenge to individual sales would be barred by Section 312 of the 1990 Appropriations Act. *See PAS*, 884 F.2d at 1239–40. The BLM should not now be able to claim that the individual sales at issue here exist in total isolation from the Strategy to which they are similarly tiered.

In sum, neither the underlying TMPs nor the Jamison "interim management strategy" has ever been submitted to FWS for consultation pursuant to the mandate of the ESA. Accordingly, the individual sales cannot go forward until the consultation process is complete on the underlying plans which BLM uses to drive their development.

The district court's order, however, did not make it clear that pending the completion of the consultation process, the BLM should be enjoined from conducting any new sales. Such an injunction is necessary because until consultation is satisfactorily concluded with respect to the Jamison Strategy, or indeed any other conservation strategy intended to establish the criteria under which sites for sales are to be selected, the sales cannot lawfully go forward. The ESA prohibits the "irreversible or irretrievable commitment of resources" during the consultation period. 16 U.S.C. § 1536(d). The sales are such commitments.

AFFIRMED IN PART, REMANDED IN PART for entry of an injunction barring future announcement or conduct of additional sales and for reconsideration of whether the 1991 sales already announced but not awarded should be enjoined.