SEATTLE AUDUBON SOCIETY; Pilchuck Audubon Society; Washington Environmental Council; Washington Native Plants Society, et al., Plaintiffs–Appellees,

v.

Mike ESPY,* in his official capacity as Secretary of Agriculture; United States Forest Service, an agency of the United States, Defendants–Appellants,

and

Washington Contract Loggers Ass'n, et al., Defendants–Intervenors–Appellants.

SEATTLE AUDUBON SOCIETY, Plaintiff-Appellant,

v.

Mike ESPY,* in his official capacity as Secretary of Agriculture; United States Forest Service, an agency of the United States, Defendants–Appellees,

and

Washington Contract Loggers Ass'n, et al., Defendants–Intervenors–Appellees.

Nos. 92–36529, 92–36560 and 92–36564.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1992.

Decided July 8, 1993.

---

* Mike Espy, the current Secretary of Agriculture, is substituted for James R. Mosely. *See* Fed. R.App.P. 43(c)(1).

700

Todd D. True and Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, for Seattle Audubon Soc., plaintiffs-appellees-cross-appellants.

Mark Rutzick, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, OR, for Washington Contract Loggers Ass'n defendants-intervenors-appellants-cross-appellees.

Anne S. Almy, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Washington, DC, for Forest Service defendants-appellants-cross-appellees.

Kevin Q. Davis, Stoel, Rives, Boley, Jones & Grey, Portland, OR, for The Ass'n of O & C Counties and Benton County, defendants-intervenors-appellants.

Before: GOODWIN, SCHROEDER, and PREGERSON, Circuit Judges.

SCHROEDER, Circuit Judge:

The United States Forest Service and Washington Contract Loggers Association, et al. (WCLA) each appeal the district court's grant of summary judgment and permanent injunctive relief in favor of Seattle Audubon Society (SAS). SAS challenged the Forest Service's Final Environmental Impact Statement and Record of Decision adopting the Interagency Scientific Committee's Report as the Forest Service's spotted owl management plan. The district court held that adoption of the Interagency Scientific Committee (ISC) Report without consideration of alternatives, and without consideration of intervening information on the status of the owl violated the National Forest Management Act, 16 U.S.C. § 1604 (NFMA) and the National Environmental Policy Act, 42 U.S.C. §§ 4321–47 (NEPA). In so holding, the district court rejected the defendants' contentions that plaintiffs lacked standing and that the dispute was not ripe. We affirm.

In appeal no. 92–36560, SAS cross-appeals the portion of the district court's March 28, 1992 judgment holding that the Forest Service was not obligated to promulgate independent regulations ensuring that critical owl habitat will not be destroyed or adversely modified. We grant WCLA's motion to dismiss the cross-appeal for lack of jurisdiction because there was no final, appealable order.

## BACKGROUND

In *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297 (9th Cir.1991) (*Evans* ), we affirmed the district court's judgment that the Forest Service had violated the NFMA by failing to prepare a plan for managing suitable spotted owl habitat in the national forests of Washington, Oregon and northern California. We also affirmed the district court's order permanently enjoining timber sales in owl habitat pending the Forest Service's preparation of an owl management plan in accordance with the requirements of both NFMA and NEPA.

As a result of our opinion in *Evans,* the Forest Service published a final environmental impact statement (EIS) for its management plan for spotted owl habitat on January 31, 1992. By its March 3, 1992 record of decision (ROD), the Service adopted regional guide amendments incorporating the recommendations of the ISC as its owl management plan. The so-called ISC Strategy has two major components. First, the plan delineates "habitat conservation areas" (HCAs) where logging would be prohibited. Second, the plan regulates the rate of cutting on forest lands between HCAs so that half of this land would provide for the safe dispersal of owls at all times through the use of the "50/11/40" rule. *See generally Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1092–93 (W.D.Wash.1991), *aff'd.,* 952 F.2d at 297.

SAS then filed this action in district court challenging the ROD and the EIS as violative of NEPA and the NFMA. The district court granted SAS's cross-motion for summary judgment on SAS's NEPA claims, granted partial summary judgment in favor

of the Forest Service on one of SAS's NFMA claims and struck the remainder of SAS's NFMA claims without prejudice to renewal upon the Service's completion of a supplemental EIS. Subsequently, the district court granted a permanent injunction prohibiting the Forest Service from auctioning or awarding any additional timber sales until the Forest Service adopts and implements revised standards and guidelines for the management of spotted owl habitat which comply with both NEPA and NFMA, 798 F.Supp. 1473. The district court ordered these guidelines to be in effect by August 20, 1993. Both the Forest Service and WCLA timely appeal. SAS timely cross-appeals.

### STANDING AND RIPENESS

The Forest Service contends that SAS lacks standing to challenge its decision to adopt regional guide amendments incorporating the ISC Strategy because no SAS member has demonstrated actual or imminent injury as required under *Lujan v. Defenders of Wildlife*, —— U.S. ——, —— & n. 2, 112 S.Ct. 2130, 2138 & n. 2, 119 L.Ed.2d 351 (1992) ("*Defenders*").

■ The Supreme Court in *Defenders* said that to establish standing, a plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical." *Id.* at ——, 112 S.Ct. at 2136 (citations omitted). There must also be a "causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Id.* (citations and internal quotations omitted). Finally, it must be "likely" as opposed to "speculative" that the injury can be redressed by a favorable decision. *Id.* The Court relied on its prior standing cases going back to *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) to hold that members of environmental groups in the United States lacked standing to challenge a rule affecting funding decisions overseas.

In support of its position that SAS lacked standing to bring this action, the Forest Service relies on *Defenders* and *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("*National Wildlife*"). It asks us to conclude that these cases materially alter the standing principles which previously applied and that these Supreme Court decisions require dismissal of plaintiffs' challenges in this case. The Forest Service's position is not well founded.

The plaintiffs in *Defenders* brought an action challenging a rule promulgated by the Secretary of the Interior interpreting Section 7 of the Endangered Species Act (ESA) as applicable only to actions to be carried out within the United States or on the high seas. The plaintiffs claimed they would be injured by the Secretary's failure to engage in ESA Section 7 consultation with respect to certain Agency for International Development (AID) funded activities abroad which plaintiffs felt would lead to "increases [in] the rate of extinction of endangered and threatened species." —— U.S. at ——, 112 S.Ct. at 2137. In support of this claim, plaintiffs included affidavits stating that each had been to Sri Lanka and Egypt several years earlier and "intended" to go there again "in the future." *Id.,* at ——, 112 S.Ct. at 2138. However, plaintiffs were unable to state precisely when (or even if) they would again visit the sites in Sri Lanka and Egypt where various building projects funded by non-party AID were proceeding in the absence of ESA § 7 consultation. Accordingly, the Supreme Court found that the evidence failed to support either a finding of "actual or imminent injury" or redressability. *Id.,* at —— – ——, 112 S.Ct. at 2138–42.

In *National Wildlife*, plaintiffs brought a challenge to the Bureau of Land Management's (BLM) "land withdrawal review program." The Court concluded that this program was not even an agency action, much less a final agency action for purposes of the general standing-to-sue provisions of the Administrative Procedure Act (APA). *See National Wildlife*, 497 U.S. at 890, 110 S.Ct. at 3189 (citing 5 U.S.C. § 704 (judicial review of final agency action)).

Here, on the other hand, SAS's challenge to the Forest Service's action that the agency itself has labeled final is supported by declarations from members describing *inter alia* their proximity to owl-inhabited forests, the frequency with which they visit these forests, and their aesthetic and scientific interest in the owl. It is clear that the declarants have been using and will continue to use forest lands suitable for owl habitat on a regular basis. Moreover, absent an injunction, the Forest Service intends to develop and offer for auction timber sales throughout and around the old-growth forest eco-system. There does not appear to be any dispute over whether further logging in old-growth forests will adversely affect the remaining owl population throughout its range. Thus, the asserted harm SAS members complain of will occur if logging takes place. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1513–18 (9th Cir.1992). Speculation that logging might not occur because of as yet unknown intervening circumstances, or because redrafting the EIS might not change the Secretary's decision to adopt the ISC Strategy as its owl management plan is not relevant to standing. *See id.* at 1518. There, as in this case, the "asserted injury is that environmental consequences might be overlooked," as a result of deficiencies in the government's analysis under environmental statutes.

■ In short, our review of the record supports the district court's conclusion that SAS has standing to challenge the Forest Service's action because the threatened harm to owl viability resulting from further logging in old-growth forests, in the absence of an owl management plan which complies with the requirements of NEPA and the NFMA, is concrete, specific, imminent, caused by agency conduct in question, and redressable by a favorable ruling. *See id.* at 1513–18; *compare Defenders*, —— U.S. at ——, 112 S.Ct. at 2138–40 and *National Wildlife*, 497 U.S. at 889, 110 S.Ct. at 3189.

■ The Forest Service also contends that its action adopting the ISC Strategy is not ripe for review until "the scope of the controversy has been reduced to more manageable proportions, and its factual components

fleshed out by some concrete action." In other words, the Forest Service contends that a challenge to its owl management plan will not be ripe until the Service authorizes a specific timber sale pursuant to the plan, because only a specific timber sale would harm either the plaintiffs or the owls. We must reject the Forest Service's position. In *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir.1992), we expressly recognized that individual timber sales are driven by an underlying owl-management plan, and in *Idaho Conservation League*, we held that plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan. 956 F.2d at 1519. In addition, in *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir.1992), we expressly recognized that individual timber sales are driven by an underlying owl-management plan.

### NEPA VIOLATIONS AND REMEDY

The Forest Service raises three principal NEPA contentions: (1) that the district court erred in finding its treatment of the so-called Anderson–Burnham Report deficient; (2) that the district court erred in finding the discussion of the impact of the owl plan on other species inadequate; and (3) that the district court erred in remanding the matter to the Forest Service for further proceedings in light of the Endangered Species Committee's decision to exempt the BLM from the provisions of the ESA for 13 timber sales in owl habitat.

■ In reviewing the adequacy of an environmental impact statement, this circuit employs a "rule of reason" that asks whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Idaho Conservation League*, 956 F.2d at 1519. Once satisfied that the proposing agency has taken a "hard look" at a decision's environmental consequences, judicial review is at an end. *Id.*

The district court concluded the Forest Service, in adopting the ISC Strategy formulated in 1990, did not adequately consider the intervening Anderson–Burnham Report prepared for the U.S. Fish and Wildlife Service.

The Anderson–Burnham Report was intended to provide an objective analysis of the available spotted owl population data. We agree with the district court's observation that "[a] chief concern of scientists of all persuasions has been whether the owl can survive the near-term loss of another half-million acres of its habitat." The Anderson–Burnham Report concludes that the spotted owl population is declining more substantially and more quickly than previously thought and specifically states that "[the rate of population decline] raises serious questions about the adequacy of the ISC Conservation Strategy and the current Consultation Process."

The EIS did not address in any meaningful way the various uncertainties surrounding the scientific evidence upon which the ISC rested. *See Southern Oregon Citizens Against Toxic Sprays v. Clark,* 720 F.2d 1475, 1479 (9th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984). It would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced with regard to the once "model" ISC Strategy. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 370–74, 109 S.Ct. 1851, 1857–59, 104 L.Ed.2d 377 (1989).

■ Even if the Forest Service concludes that it need not undertake further scientific study regarding owl viability and the impact of further habitat loss, the Service must explain in the EIS why such an undertaking is not necessary or feasible. *See* 40 C.F.R. § 1502.9(b) (duty to respond to credible opposing view); *California v. Block,* 690 F.2d 753, 773–74 (9th Cir.1982).

In keeping with the Forest Service's failure to include a full discussion of the scientific uncertainty surrounding the ISC Strategy is the Forest Service's failure to include a meaningful discussion of what effect, if any, a decrease in owl viability will have on other old-growth dependent species, especially given the owl's status as a management indicator species for purposes of the NFMA. The Service argues that it adopted this plan pursuant to the district court's order we affirmed in *Evans* to ensure the viability of the

owl and, therefore, there is no need to discuss the effects of further owl losses on the old-growth forest eco-system.

■ The Service's position is that it will address other species in other, yet-to-be-created plans. In order to allow for the sort of reasoned decision-making contemplated by NEPA, however, an owl management plan destined to be a driving force behind various land-use decisions on lands suitable for spotted owl habitat should include a discussion of the effects the various alternatives and ultimate choice would have on other old-growth dependent species found within the same locations. *See Evans,* 952 F.2d at 304. Each individual forest management plan must be adopted in compliance with the regional guidelines and standards. *See* 16 U.S.C. § 1604(g). If it is based on an incomplete NEPA analysis of the consequences continued logging will have on owl and other old growth dependent species' viability over both the short and long term, there will be a gap in planning that cannot be closed. The district court correctly held that the Forest Service's adoption of the ISC Strategy inadequately dealt with its effect on other old growth dependent species.

The district court also correctly held that the Forest Service improperly based its owl viability assessment on its assumption that all agencies involved were going to follow the ISC Strategy or some similar plan and that the ESA would apply. The status of the BLM's intentions and planning for continued logging within owl habitat entrusted to its care, for example, remains unclear. Specifically, to date, the BLM has not announced that it will follow the ISC Strategy or that it will prepare any other similar plan. In fact, the BLM's first attempt at planning for the owl, the less protective Jamison Strategy, has so far failed to pass muster under the ESA. *See, e.g., Lane County,* 958 F.2d at 291–93.

■ Because the Forest Service's EIS rests on stale scientific evidence, incomplete discussion of environmental effects vis-à-vis other old-growth dependent species and false assumptions regarding the cooperation of other agencies and application of relevant

law, the district court did not err in concluding that the Forest Service must re-examine its chosen alternative.

 Our review of the record does not reveal that the district court based its injunction on erroneous legal conclusions or findings of fact. Nor did the district court abuse its discretion in fashioning the remedy. Because the district court has indicated its willingness to entertain requests for extensions of time to comply with its order, we need not address at this time the issue of whether the deadlines for compliance are unduly harsh. *See generally, Gaudiya Vaishnava Soc'y v. City and County of S.F.*, 952 F.2d 1059, 1062 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992).

### THE SAS CROSS-APPEAL

The ruling SAS seeks to challenge in its cross-appeal is a partial summary judgment in favor of the Forest Service and WCLA which neither denies nor grants injunctive relief. As such, the order is not appealable under 28 U.S.C. § 1292(a). SAS has obtained an injunction under NEPA and the district court has left open the possibility of granting injunctive relief under the NFMA in the future. The order attempted to be appealed is not a final disposition of the NFMA claim. *See* 28 U.S.C. § 1291; Fed. R.Civ.P. 54(b), 56(d); *see also Sierra Club v. Department of Trans.*, 948 F.2d 568, 571–72 (9th Cir.1991). Accordingly, we dismiss the cross-appeal for lack of jurisdiction.

### CONCLUSION

The judgment and permanent injunction of the district court on appeal in nos. 92–36529 and 92–36564 are AFFIRMED. All issues relating to the deadlines for compliance with the district court's injunction shall be addressed by the district court in the first instance. WCLA's motion to dismiss cross-appeal no. 92–36560 is granted; cross-appeal

* Bruce Babbitt, the current Secretary of Interior, is substituted for former Secretary Lujan. *See*

no. 92–36560 is DISMISSED for lack of jurisdiction.